THERESA M. WROBLESKI,
          Plaintiff,


vs.                                      CIVIL NO. 2:07-CV-12437

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,      DISTRICT JUDGE GERALD E. ROSEN
          Defendant.          MAGISTRATE JUDGE STEVEN D. PEPE
_____/


## REPORT AND RECOMMENDATION

### I.    BACKGROUND

Theresa M. Wroblewski brought this action under 42 U.S.C. § 405(g) to challenge a final

decision of the Commissioner denying her application for Social Security Disability Insurance

Benefits ("DIB"). Both parties have filed motions for summary judgment, which have been

referred pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the following reasons, it is

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's

Motion for Summary Judgment be **GRANTED**.

### A.    PROCEDURAL HISTORY

Plaintiff filed an Application for DIB on November 8, 2000 (R. 60), alleging she became

disabled on January 15, 1997,[1] due to Fibromyalgia, myofacial pain syndrome and allergies (R.

42, 73). After Plaintiff's claim was denied administratively on May 23, 2001 (R. 41-42), she

filed a Request for Hearing (R. 47). Administrative Law Judge E. Patrick Golden ("ALJ") held a

---

[1]Plaintiff's Application for DIB (R. 60) states that she became unable to work on January 15, but the Administrative Law Judge's decision states that the Plaintiff's application alleged a disability onset date of November 11, 1997 (R. 594).

hearing on May 9, 2002 (R. 36), at which Plaintiff was represented by a non-attorney claims representative (R. 39-40). Vocational Expert Pauline Pegram ("VE") testified at the hearing (R. 594). In an August 9, 2002, decision, the ALJ concluded that Plaintiff was not under a disability (R. 591-604). Plaintiff's appeal to the Appeals Council resulted in a remand on June 4, 2004 (R. 629-31).

The ALJ held a new hearing on October 7, 2004 (R. 28-31), at which Plaintiff, again represented by a non-attorney, and her husband testified (R. 691-725). Plaintiff received her second unfavorable decision by the ALJ, on January 19, 2005 (R. 16-27). The Appeals Council denied Plaintiff's request for review on April 9, 2007 (R. 7-9).

## B. BACKGROUND FACTS

Plaintiff, born August 29, 1949, is 5'3" tall, weighs 120 pounds, and was 52 at the time of the first hearing before the ALJ (R. 60, 72, 594). Her last date of insured status ("DLI") was June 30, 2000 (R. 63). Plaintiff received a graduate equivalency diploma and completed a year of cosmetology school (R. 79).

### 1. *Plaintiff's Testimony and Statements*

#### a. Plaintiff's Work History

At the first hearing, Plaintiff testified that she had stopped working as a paraprofessional Northville Schools because she was "getting a lot of pain" in her back and head (R. 729). The doctors at Harbor Oaks Hospital diagnosed her with Fibromyalgia and major depression (R. 157).

Plaintiff quit her previous job as a hairdresser/cosmetologist at JC Penney, where she had worked from Spring of 1995 to January 1997, because she "became very sensitive to the

chemicals" and developed asthma (R. 74, 99, 729).[2]  While working she would "get very shaky" when she was doing someone's hair (R. 696).  On one occasion, she passed out and her co-workers started to call 911 before she came around (R. 697).  Afterwards, a doctor diagnosed her with "a very bad case of asthma." Starting in 1992 for an unknown period of time, Plaintiff also indicated in her Work History Report that she worked as a cosmetologist for Fantastic Sam's Hair Salon (R. 99).

Prior to her jobs as a hairdresser/cosmetologist, she worked as a secretary at the University of Michigan Center for Education between May 1987 and March 1990.[3]  Plaintiff was let go from this position because she "wasn't keeping up with the work well" and was not finding her mistakes (R. 695).  After that, she went to the Michigan Rehab Center in Ann Arbor, where a series of tests determined that she was "severely dyslexic."

Between May 1986 and May 1987,  Plaintiff worked as a receptionist for a mortgage company (R. 74, 99, 705).  At this job, her duties included light filing and connecting phone calls to the loan officers (R. 705).  She eventually quit because the job was too stressful.

### b.    Plaintiff's Testimony

At the hearing, Plaintiff testified that she has pain in her mid and upper back, shoulders, neck, head, and hips (R. 733).  She could not sit, stand, and walk for eight hours without having to lie down.  Stress on the job increased her pain (R. 705).  During the period from 1997 to June 2000, she could not perform repetitive movements with her arms because it caused pain (R.

---

[2]Plaintiff testified that the reason she stopped working as a cosmetologist was because of sensitivity to the chemicals (R. 729), but she told staff at Harbor Oaks Hospital that she left because of problems with her coworkers (R. 158, 168).
[3]Plaintiff listed in her Disability Report that she work at the University of Michigan between May 1987 and March 1990 (R. 74), but her Work History Report has March 1991 as the termination date (R. 99).

707). Being on her feet longer than 20 minutes caused extreme fatigue. She could not sit for any length of time because she developed pain and stiffness (R. 707-08). She had pain throughout her body – in her hips and back (R. 708). She could lift a gallon of milk, but not comfortably (R. 710).

Plaintiff had recently taken a cruise with her husband and had been fairly comfortable due to the warm weather, which helped her. Yet, she was limited in what she could do at home and did not cook for her husband (R. 710-12).

Plaintiff watches television and reads (R. 730), yet she has difficulty concentrating and could not remember things because she was in a "major fog" (R. 738).[4] Her relationship with her husband is "fair" although she has little interest in sexual relations (R. 730). She does not travel (R. 731) and started attending a Bible study which she missed several times because of her pain and fatigue (R. 730). She cannot shop alone (R. 732). Plaintiff could sit for only 30-40 minutes, stand for 10-20 minutes, and lift 5 pounds, but any repetition that she did with her arms caused her a great deal of pain (R 707-09). Side effects of her pain medication include "[d]rowsiness, grogginess, [and] having a hard time with clear thinking" (R. 699).

### c. Spouse's Testimony and Statements

Plaintiff's husband completed a questionnaire regarding her daily activities on December 3, 2000 (R. 82-90). He indicated that she watched television and movies 6-7 hours per day (R. 85). It took her about three hours to get ready to leave the house, then she ran an errand or did some task, and then rested again (R. 82). When she was in pain, she was not sociable (R. 83).

---

[4]The ALJ stated that Plaintiff testified that she has trouble reading because she is in a "fog" (R. 597). The transcript does contain a remark about Plaintiff being in a fog, but not with regards to the fog interfering with her ability to read (R. 738). Plaintiff's remark about being in a fog related to her memory and her concentration.

She did little or no household chores (R. 84-85, 89).  She rarely cooked and they ate out at least once per week (R. 84-85, 88).  She slept for 10-11 hours (R. 85).

###### 2.    *Plaintiff's Medical History Prior to June 30, 2000 (DLI)*

Just prior to leaving her position as a cosmetologist at JC Penney, Plaintiff was seen in the Emergency Room of St. Mary Hospital on three occasions (R. 304-07).  On November 27, 1996, she went to the Emergency Room with a persistent sinus infection (R. 306-07).  She also complained of neck and back pain and some nausea.  On December 4 and 7, 1996, Plaintiff went to the Emergency Room with complaints of nausea (R. 304-05).

Prior to stopping work as a paraprofessional, from April 1997 until June 1997, Plaintiff attended physical therapy sessions at the direction of Nancy Wirth, M.D. (R. 302-03).  Upon being discharged, she reported good relief of overall stiffness and headaches (R. 302).  It was noted that she was "extremely concerned about her 'illness' and felt that her 'illness' would eventually disable her." Plaintiff was instructed to continue with the exercises at home.

In July 1997, Plaintiff was admitted to Harbor Oaks Hospital for ten days under the care of Suresh Bilolikar, M.D., because of severe depression, feelings of hopelessness and helplessness, suicidal ideations, multiple somatic symptoms, obsessive compulsive disorder, and Fibromyalgia (R. 157, 596).  At this time Plaintiff was taking Domperidone, Prilosec, Propulsid, Trazodone, Restoril, Zoloft, Klonopin, and a digestive enzyme.[5]  Plaintiff was transferred from an inpatient clinic, New Life Clinic, to the partial hospital program (R. 261).  Plaintiff was having gastrointestinal symptoms/digestion problems (R. 263, 273).  Upon discharge from the

---

[5]The ALJ opinion stated that Plaintiff began taking the medication after admission to the Harbor Oaks Hospital (R. 596), but the Harbor Oaks Hospital Admission Nursing Assessment listed the same medications under current medication suggesting that Plaintiff was already taking the medication prior to admission (R. 233).

partial hospital program, her Global Assessment of Functioning ("GAF")[6] according to Dr.

Bilolikar's Discharge Summary was 50 (R. 262).[7]

In January 1998, Plaintiff began treatment with Marshall Sack, D.O., for

gastroparesis/Gastroesophagael Reflux Disease (R. 530, 532, 534-37), myofascial pain

syndrome/Fibromyalgia (R. 499, 501, 503, 505-06, 508, 510-11, 523, 530, 532, 534-37), and

emotional/psychiatric issues such as "depressive mood" and "adjustment disorder." (R. 510-11,

517, 523, 526, 535).  Additionally, Dr. Sack mentioned either chronic fatigue syndrome, and/or

problems with fatigue and/or insomnia in his records between 1998 and 2000 (R. 497, 520, 522,

532, 537).

On October 29, 1998, Plaintiff was involved in a motor vehicle accident, and was seen in

the Emergency Room of Botsford General Hospital (R. 558).  She had no recollection of what

happened and was released with the final diagnosis of multiple strains (R. 558-59).

Plaintiff was referred to Samuel Indenbaum, M.D., a rheumatologist, on May 3, 1999,

who noted Fibromyalgia, chronic fatigue syndrome, mild scoliosis, and long standing depression

_____

[6]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders*, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *See id.* at 32.  A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.*  A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.*  A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*
[7]Dr. Bilolikar listed Plaintiff's Adaptive Functioning as 50 on his Discharge Summary dated August 26, 2000 (R. 262), nearly a month after her discharge, but listed her Axis 5 as 40% on the Discharged Patient Face Sheet dated July 28, 2000 (R. 259), the date of her discharge, and her GAF as 40 on an Interim Psychiatric Evaluation dated July 22, 2000 (R. 264).  It is unclear if the Discharge Summary reflects an improvement in Plaintiff's GAF.

(R. 569-70).  On May 28, 1999, Plaintiff was again admitted to Botsford General Hospital with acute, generalized pain, "secondary to fibromyalgia." (R. 552).  She was already taking Propulsid, Prevacid, Luvox, Desyrel and Soma.  Plaintiff was given a shot of Demerol and Vistaril and was prescribed Vicodin.

On June, 5, 1999, Plaintiff was seen in the Emergency Department of St. Mary Hospital (R. 301), followed by a pain medicine consultation at William Beaumont Hospital on July 1, 1999 (R. 308-11).  Craig Hartrick, M.D., completed the pain evaluation (R. 308-19).  Plaintiff reported a two year history of pain in her neck, upper back and shoulder (R. 308).  Plaintiff indicated that she had been diagnosed with myofascial pain syndrome and/or Fibromyalgia by her rheumatologist and physiatrist.  Her pain was described as stabbing, gnawing, pulling, heavy, exhausting and grueling, and was rated as a 9 on a scale of 0 to 10.  Dr. Hartrick noted that her symptoms were consistent with a Fibromyalgia-like syndrome, but with some kind of variation because she failed to have 11 or more reproducible tender points (R. 310).  She had a full range of motion of the infraspinatus musculature and no palpable trigger points.  He found her low back disability score that indicated severe disability was out of proportion to the physical findings (R. 309).  Dr. Hartrick suggested that her reports of depression and anxiety may explain the discrepancies.  At the time of the consultation by Dr. Hartrick, Plaintiff had prescriptions for pain medications, including Vicodin, Skelaxin, Darvocet, Celebrex, Parafon Forte, Soma, and Demerol (R. 301, 309, 503, 505, 507-11, 535, 551-52).  In addition, Plaintiff was taking Desyrel, Luvox, Prevacid, and Propulsid (R. 309).

On July 15, 1999, an esphgogastroduodenoscopy, revealed a tiny hiatal hernia with mild reflux and mild antral gastritis (R. 542).  Biopsies were also taken.

Beginning in August 1999, office notes from Jeffrey Nusbaum, M.D., an internist, continue to document Plaintiff as suffering from Fibromyalgia, as well as GERD and a hormone imbalance (R. 379). Dr. Nusbaum, who is associated with The Center for Holistic Medicine, began to administer Meyer's IV injections to the patient (R. 360, 363, 365, 367, 374, 376-77). In September 1999, Dr. Nusbaum added Neurontin and Effexor to Plaintiff's medication regimen (R. 375), with Lortab, A. Thyroid, Cortef, and Trazodone added by October 1999 (R. 373).

On May 11, 2000, one month before her DLI, Plaintiff was admitted to St. Mary Hospital because of a syncopal episode, which was attributed to a combination of dehydration and Duragesic overdose (R. 328-29). The Duragesic along with OxyContin had been prescribed by Gail Majcher, Ph.D., for her excruciating pain (R. 486, 698). The diagnostic impression was that of opioid dependence with inadvertent overdose likely, opioid withdrawal, Fibromyalgia per history, nutritional compromise, and questionable thyroid disease (R. 332).

Plaintiff was transferred to the hospital's Chemical Dependency Unit and remained a patient there from May 12 through May 19, 2000 (R. 320-49). After detoxification treatment, the discharge diagnosis noted: opioid-type dependence, continued use; hepatitis; drug withdrawal syndrome; major depressive affective disorder, recurrent type, unspecified; myalgia and myositis unspecified; hypopotassemia; unspecified gastritis and gastroduodenitis; chronic pancreatitis; esophageal reflux; anemia, unspecified; and, unspecified nutritional deficiency (R. 321). After her hospitalization, she stopped taking her pain medication and got worse (R. 698). She was then given Methadone, as well as Neurontin for nerve pain (R. 698-99). These medications had side effects, including drowsiness, grogginess, and difficulty with clear thinking (R. 699). On May 30, 2000, Plaintiff returned to St. Mary Hospital, this time to the Emergency Room with acute abdominal pain, pancreatitis and dehydration (R. 350).

Plaintiff was referred to Steven Arbit, M.D., who evaluated her on June 8, 2000, and found that she had fourteen of eighteen myofascial tender points (R. 487).  Upon examination, she was able to get on and off of the examination table without difficulty, her gait was normal, and she had full range of motion of the cervical spine and upper extremities.  He increased her Neurontin and Vioxx and prescribed Zanaflex and prescribed physical therapy (R. 457, 481-87).  She had also been prescribed Aciphex, Ultram, Effexor, Pamelor, Humibid L.A. (Gualfenesin), and Trazodone  (R. 457-59).  Shortly thereafter, Plaintiff began a course of physical therapy at SpectraMed, referred there by physiatrist, Dr. Arbit (R. 423).[8]  The physical therapy included myofacial release.  Plaintiff indicated that the treatment helped, but the benefit stopped when she stopped the therapy (R. 699-700).

At the initial evaluation at SpectraMed, Plaintiff indicated that on a scale of 0-10, with 10 being intense constant pain, the worst pain she experienced was a 10, it was generally from 7-9, 6-7 at best, 3 before rising, after rising 6-7, mid-day 7-8, evening 8-9, and 1 while sleeping at night (R. 481).  Plaintiff had pain at rest, with activity, after activity, and with coughing.  Almost any activity other than sitting or walking increased her pain.  The pain was constant and described as a sharp radiating ache.  Concerning her overall ability to function on a daily basis, Plaintiff stated that she had no good days, was generally operating at about 20-30%, and 10% on a bad day (R. 482).

Dr. Arbit expressed concern in a letter to Dr. Nusbaum  on June 8, 2000, that the Plaintiff was solely interested in narcotic medication and not physical therapy, despite his impression that physical therapy would be good for Plaintiff (R. 487).  When this comment was brought to

_____

[8]Plaintiff contends in her summary judgment motion that she started physical therapy on June 2, 2000, but the evidence that she cites is a referral slip dated June 8 and Physical Therapy report dated June 27.

Plaintiff's attention, she testified that the stretching exercises were not good for her and increased her pain (R. 701). She had been helped by myofacial release, but the stretching she did at home was not good.

### 3. *Medical History After June 30, 2000 (DLI)*

At a re-evaluation on August 30, 2000, Plaintiff reported that generally, the pain was a 4-5 with the worst pain reaching a 7 (R. 407). Her therapy was helping. Her ability to function on a daily basis was up to 45% and she could do more things such as sweep and shop if she had help lifting.

Her psychologist noted in December 2000 that she "tries to do artistic activities when possible," suggesting that she was engaging in some activity (R. 492, 597).

A Psychiatric Review Technique Form was completed by a DDS physician on January 4, 2001, found that there was "No Medically Determinable Impairment" and no functional limitations (R. 114-124). The Form completed by the same doctor on April 2 found an affective disorder of depression, that a RFC assessment was necessary and Plaintiff had coexisting non-mental impairments (R. 128, 131). Plaintiff had mild restrictions in the activities of daily living and maintaining social functioning; and moderate restrictions in maintaining concentration, persistence, or pace (R. 138). She was also found to have moderate difficulties in understanding, remembering and carrying out detailed instructions, and interacting appropriately with the general public (R. 142).

Plaintiff's physical residual functional capacity evaluation dated both February 22 and May 16, 2001, found Plaintiff capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, standing six hours in an 8-hour workday, sitting six hours in an 8-hour workday, and unlimited pushing and pulling (R. 146-53).

On March 14, 2001 Plaintiff told the DDS consultant, I. Youssef, M.D., that her depression began in her 30's and medication stabilized her condition such that she did not feel depression was a major problem except when she becomes sad and frustrated because of the Fibromyalgia (R. 573). Dr. Youssef diagnosed Plaintiff with major recurrent depression in partial remission (R. 575). Her GAF was evaluated to be 65, which represents only mild symptoms. Dr. Youssef also noted that "[m]ost of the patient's difficulty is due to he chronic pain." His prognosis for her depression was good and that it was "at least partially controlled so far."

In April 2001, she told consultative medical examiner Dr. Elizabeth Edmond, M.D., that she drove herself to the appointment, was able to care for her personal needs, and her husband helped with cooking and household chores (R. 578). Other than a slightly reduced range of motion in the lumbar spine Dr. Edmonds findings were unremarkable.

Plaintiff reported that the pain had developed suddenly four years earlier as a dull pain in the upper back with tiredness, fatigue and insomnia (R. 577). She also reported being dizzy in the mornings and being in a "fibro fog" (R. 578). Upon examination, she had some tenderness upon palpation and very slightly decreased range of motion, but she had good to normal strength and was able to walk on heels and toes, stand on alternating legs, heels and toes, get dressed and on and off of the examination table without difficulty, and had no muscle spasms (R. 579-80).

On April 11, 2001, Dr. Sack, Plaintiff's family doctor, wrote a "To Whom It May Concern" letter stating:

> [Plaintiff] is presently under my ongoing medical care for Fibromyalgia-Myofascial Pain Syndrome. [She] was seen for a physical examination on 4-11-01. [She] continues to manifest ongoing symptomatology of somatic nature in keeping with her above-stated diagnosis. She continues to experience symptoms

> including ongoing generalized myalgias, arthralgias, and extreme
> fatigue, headaches, sleep disturbance and insomnia. She is
> presently on Effexor 225 mg XR daily, Neurontin 600 mg three
> times daily and Desyrel 150 mg at bedtime.

(R. 576).

On October 25, 2001, Dr. Jeffrey Nusbaum, Plaintiff's internist, completed a questionnaire regarding Plaintiff's condition prior to June 30, 2000, that was provided to him by Plaintiff's claims representative (R. 585-86). Asked to assess Plaintiff's functioning prior to June 30, 2000, Dr. Nusbaum checked "findings" of Fibromyalgia: pain in multiple muscles and joints; pain with trigger point pressure; muscle spasms and/or tension; irritable bowl/GI disturbance; headaches; disturbed sleep patterns, low daytime energy levels; and impaired memory and cognitive skills (R. 585). He did not think that Plaintiff's physical symptoms were worsened by emotional factors. Dr. Nusbaum stated that Plaintiff was currently being followed for Fibromyalgia that was exacerbated by hormonal and nutritional imbalance. He stated the Plaintiff, during the period ending June 30, 2000, would have difficulty with prolonged sitting and also with prolonged standing/walking (R. 586). Even with a sit/stand option, Plaintiff could not work on a sustained basis even if she could rest as much as 20 minutes per hour.

Dr. Majcher completed a mental residual functional capacity assessment on November 1, 2001 (R. 587-88). Nearly all work-related abilities were evaluated to be fair.[9] Dr. Majcher also noted that Plaintiff's abilities had been at this level for a number of years.

On December 11, 2001, Dr. Sack completed a questionnaire regarding Plaintiff's condition prior to June 30, 2000, again on a short form apparently provided by Plaintiff's claims representative (R. 589-90). Dr. Sack checked the following "findings": pain in multiple muscles

---

[9]Plaintiff's ability to understand, remember and carry out complex job instructions was rated as "Poor/None" (R. 588).

and joints; pain with trigger point pressure; muscle spasms and/or tension; irritable bowl/GI disturbance; headaches; disturbed sleep patterns, low daytime energy levels; muscle weakness unexplained by other conditions; mood disturbance; and impaired memory and cognitive skills (R. 589). He did not think that Plaintiff's physical symptoms were exacerbated by emotional symptoms; rather he thought she became depressed when her pain was worse. Dr. Sack opined that even with a sit/stand option, Plaintiff could not work on a sustained basis even if she could rest as much as 20 minutes per hour (R. 590).

### 4. *Vocational Expert's Testimony*

The vocational expert classified Plaintiff's past relevant work as semi-skilled sedentary and skilled light work (R. 739-40). The ALJ asked the VE to assume somebody who suffers from a combination of emotional problems and pain that interferes with that person's ability to even concentrate on simple tasks (R. 740). The VE determined that such a combination of problems would eliminate all of Plaintiff's previous jobs. The ALJ then added that the person had pain such that they could concentrate on simple tasks but not complex task. It was the VE's opinion that both skilled and semi-skilled jobs would require Plaintiff have an ability to carry out complex tasks. The ALJ then modified the hypothetical to a person that had pain and emotional problems on a level that interfered with the person's ability to concentrate at times, but the person still was able to concentrate enough in a 8-hour day to do some more complex tasks. The VE opined that the person would then be able to perform Plaintiff's previous semi-skilled jobs.

Plaintiff's representative was then given an opportunity to examine the VE (R. 741). The representative asked if an individual had pain that required the individual to be able to rest at will would that affect the person's ability to do work. The VE confirmed that it would prevent her from doing her job. The representative added that if this also affected the individual's ability to

13

be emotionally reliable and to relate to others on a consistent and appropriate basis would that also affect her ability to work (R. 741-42). The VE affirmed that this would also prevent her from finding work (R. 742).

At this point, the ALJ asked about the existence of unskilled jobs in the state of Michigan. The VE testified that there are "well over 300,000" unskilled light jobs in the state (R. 742-43). The VE also avowed that her testimony was consistent with the Dictionary of Occupational Titles (R. 743).

### 5. The ALJ's Decision

ALJ Golden found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability (R. 17). Plaintiff's depression was found to be "severe," but it did not meet the criteria of Listing 12.04 affective disorders (R. 19). Nor were any of Plaintiff's symptoms found to meet the criteria of Listing 12.07 somatoform disorders. The ALJ recognized that the medical evidence indicated a diagnosis of severe impairments, Fibromyalgia and/or myofascial pain syndrome, but determined that they were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. He found Plaintiff could perform a full range of unskilled light work (R. 26). Using Medical-Vocational Rule 202.14 he found Plaintiff not disabled.

The ALJ found that Plaintiff's reports of her pain level were not well supported by the objective evidence (R. 22). The ALJ noted that the lack of objective evidence alone was not sufficient to find Plaintiff not credible, other factors were also not supportive of the severity she alleged. The ALJ looked to her lack of continuing physical therapy exercises despite marked improvement in her pain per her own reports, inconsistencies in her statements and throughout

the evidence, Dr. Hartrick's report, Dr. Arbit's treatment notes and statements, and Dr. Sack's notation that her symptoms are somatic (R. 22-23).

The ALJ also found inconsistencies in Plaintiff's explanation for why she stopped working as a cosmetologist (R. 23). The Plaintiff's Disability Report, filed November 8, 2000, indicated that she stopped working because she "developed allergies" to the chemicals she used (R. 23, 73). The Harbor Oaks Hospital Initial Psychiatric Evaluation noted that she stopped working "because of problems with the staff at the workplace" (R. 23, 158). She told Dr. Edmond that she stopped working because of her severe pain (R. 23, 578). The ALJ determined that these inconsistencies detracted from her overall credibility (R. 23). In general, the ALJ found that the record as a whole detracted from Plaintiff's overall credibility.

The ALJ relied on Dr. Hartrick's report in making his determination (R. 23). Dr. Hartrick suggested that a more appropriate treatment than narcotics would be for Plaintiff to undergo biofeedback training (R. 310). Although she expressed interest in this option, it appears that she never pursued the treatment (R. 310-11). Dr. Hartrick noted that her symptoms were consistent with a fibromyalgia-like syndrome, but it was some sort of variation because she failed to have 11 or more reproducible tender points. He also observed that her primary concern was "being isolated and being cut off from her medication [Vicodin]."

The ALJ also looked to Dr. Arbit's treatment notes and statements as being detrimental to Plaintiff's credibility. Dr. Arbit was the doctor who prescribed physical therapy for the Plaintiff (R. 468, 489). At an evaluation in October, Plaintiff told Dr. Arbit that "things are going okay" (R. 458). In December, Plaintiff reported that she had stopped doing her exercises and instead asked for stronger medication, which Dr. Arbit did "not think are [a] very good

choice for her because she does quickly develop a tolerance and then becomes addicted" (R. 457).

The medical opinion of Dr. Sack was given little weight by the ALJ because the opinion was not consistent with substantial evidence of record (R. 23).[12] The ALJ found that because Dr. Sack did not provide the principle medical findings for his assessment, the opinion could not be given controlling weight without adequate support. The opinion was supported by medically acceptable diagnostic techniques for Fibromyalgia, but the diagnostic techniques were largely based upon Plaintiff's subjective complaints.

Dr. Nusbaum's opinion, which concluded that the Plaintiff had the same limitations as did Dr. Sack's, was also given limited weight for the same reasons the ALJ gave to discredit Dr. Sack's opinion (R. 23-24). Dr. Nusbaum noted Plaintiff exhibited typical Fibromyalgia signs and symptoms that were exacerbated by hormonal and nutritional imbalances, but that her depression did not heighten her physical symptoms (R. 23).

The ALJ determined that the statements provided by Dr. Majcher were conclusory and had little merit without treatment notes or other support (R. 24). Dr. Majcher indicated that Plaintiff was a well functioning individual prior to her chronic pain, but since the Plaintiff alleged that her pain began in 1997 and Dr. Majcher did not begin treating her until mid 1999, this statement must have been based solely upon Plaintiff's report and not Dr. Majcher's own observations. Further, the ALJ stated that Dr. Majcher had overstated the Plaintiff's condition based upon review of the evidence as a whole and that the opinion was based on Plaintiff's pain

---

[12]The ALJ opinion actually said that the opinion was "not inconsistent" with the evidence, but this does not make sense in the context. If the opinion was actually "not inconsistent" then there would have been no reason to discredit it.

rather than symptoms of depression, for which the doctor might be qualified to opine. For these reasons, her opinion was also given little weight.

The ALJ ruled that the Residual Function Capacity Assessment provided to Drs. Sack and Arbit by Plaintiff's non-attorney representative was poorly drafted and did not allow them any discretion to express their opinions in their own words and relate the opinions to the objective medical evidence. Further, the forms were not in accordance with any forms utilized by the Social Security Administration to elicit medical source opinions. This further detracted from the weight assigned to them.

The ALJ recognized Plaintiff's physical and mental residual functional capacities by state agency examiners as expert opinion evidence that must be addressed. Both were accorded limited weight because they were made by a non-treating, non-examining individual, were not fully consistent with the evidence of record, and were made without the benefit of the full record (R. 24-25).

Dr. Youssef's diagnosis of the Plaintiff with major recurrent depression in partial remission and a GAF of 65, meaning mild symptoms and the individual is generally well functioning, were deemed more in line with the medical evidence and well supported (R. 24). His opinion was given "at least moderate weight."

The ALJ employed a function by function analysis as required by SSR 96-8p and found that the Plaintiff could lift at least 20 pounds occasionally; could lift 10 pounds frequently; and could sit, stand, or walk for eight hours in a work day (R. 25). The ALJ determined that the Plaintiff was mentally capable of understanding, remembering, and carrying out simple instructions. The ALJ opined that this placed Plaintiff's residual functional capacity at a full range of unskilled light work, however it did preclude her past relevant work which the VE

17

classified as semi-skilled or better. Because the ALJ determined that Plaintiff was capable of performing the full range of unskilled light work and the VE had testified that approximately 300,000 of those jobs exist in the State of Michigan, the ALJ concluded that Plaintiff retained the capacity for work and was not disabled (R. 26).

## II.    ANALYSIS

In her motion for summary judgment, Plaintiff argued that (1) the ALJ improperly assessed Plaintiff's credibility, effects, symptoms and limitations of Fibromyalgia and complaints of pain; (2) the ALJ failed to give proper weight to the opinions and assessments made by Plaintiff's treating physicians; (3) the ALJ improperly assessed Plaintiff's residual capacity; and (4) the ALJ's decision that Plaintiff is capable of gainful activity is contrary to the evidence on record and the law (Dkt. #17).

### A.    STANDARD OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health & Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

### B.    FACTUAL ANALYSIS

#### 1. *Credibility*

##### a.    Legal Standard

Plaintiff contends that the ALJ improperly assessed her credibility as it pertains to her allegations of pain and limitations.  Subjective evidence is only considered to "the extent…[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" 20 C.F.R. 404.1529(a).  The ALJ is not required to accept a plaintiff's own testimony regarding allegations of disabling pain when such testimony is not supported by the record.  *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The issue of a plaintiff's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion.  *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Comm'r of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In *Jones*,  336 F.3d at 476, the Court noted that an ALJ can reject a plaintiff's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

Here, the objective evidence within the record failed to establish the presence of any underlying physical condition that could reasonably be expected to produce Plaintiff's alleged disabling pain, and, there was no evidence of any resultant effects caused by any underlying condition that would substantiate Plaintiff's alleged disabling pain.  *See* 20 C.F.R. §

404.1529(a)(b)(c); Social Security Ruling (SSR) 96-7p; *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369-1370 (6th Cir. 1991); *Felisky v. Bowen*; 35 F.3d 1027, 1038-39 (6th Cir. 1994).

In light of the conflicting medical evidence, the ALJ did not find Plaintiff's allegations regarding her pain and limitations to be fully credible. Review of a credibility determination requires the court "to accord the ALJ's determinations of credibility great weight and deference particularly because the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying. Therefore, we are limited to evaluating whether or not the ALJ's explanations for partially discrediting [a plaintiff] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476 (citation omitted).

### b.        Plaintiff's Reports of Her Pain Level

The ALJ determined that Plaintiff's claims of her pain level were not supported by the objective or other evidence (R. 22). In particular, the ALJ noted that Plaintiff did not continue physical therapy exercises at home despite her admission and the reports of multiple doctors that the physical therapy had helped reduce the pain (R. 23). Plaintiff's testimony regarding the physical therapy is a bit muddled, but a careful reading shows that Plaintiff testified that while she was having the physical therapy, she "was feeling somewhat better" (R. 699). She claimed that stretching, which she did not continue at home, was "very difficult" and "not good" for her (R. 700-01), but some part of the physical therapy did help (R. 699). This is supported by her reports to Dr. Arbit that the pain levels were decreasing as the therapy progressed (R. 407, 436, 451).

The ALJ stated that Plaintiff's pain level were contradicted by Dr. Hartrick's report (R. 22-23). Dr. Hartrick twice noted her asserted pain was out of proportion to the physical findings

20

(R. 309-10). Dr. Hartrick reported that Plaintiff requested and received a prescription for Vicodin, but he did not agree to provide it on an ongoing basis (R. 310). Dr. Hartrick also suggested that a more appropriate treatment than narcotics would be for Plaintiff to undergo biofeedback training. Although she expressed interest in this option, it appears that she never pursued the treatment (R. 310-11).

The ALJ also looked to Dr. Arbit's treatment notes and statements as being detrimental to Plaintiff's credibility. Dr. Arbit was the doctor who prescribed physical therapy for the Plaintiff (R. 468, 489). At the conclusion of her prescribed sessions of physical therapy, Plaintiff expressed interest in continuing physical therapy through a maintenance-type program and Dr. Arbit did write it for her (R. 459). Plaintiff expressed concerns that her insurance might not pay for the treatment. At a subsequent evaluation in October, Plaintiff told Dr. Arbit that "things are going okay" (R. 458). There was no suggestion of a problem until December, when Plaintiff reported that she had stopped doing her exercises and instead asked for stronger medication, which Dr. Arbit did "not think are [a] very good choice for her because she does quickly develop a tolerance and then becomes addicted" (R. 457).

Dr. Arbit stated in an August 2, 2000, office note[13] that he believed that it was conceivable that Plaintiff had Fibromyalgia and myofascial pain to begin with and her motor vehicle accident in 1998[14] exacerbated and accelerated the symptoms that she was having, but this would be based on statements from Plaintiff and her medical history (R. 460). When he first examined Plaintiff she had just completed drug detoxification, his physical examination was essentially normal except for 14 of 18 myofascial tender points (R. 487). She claimed severe

---

[13]This is two months after Plaintiff began physical therapy (R. 423).
[14]Roughly one year after her onset date (R. 558, 594).

pain which Dr. Arbit thought was possibly related to seeking narcotic medication after checking with her addictionologist he put her on Zanaflex, but he questioned her decision against physical therapy thinking that the stretching which she had quit "would be most prudent" (*Id.*).

The ALJ found that Dr. Sack's notation that Plaintiff's symptoms were somatic damaged her credibility (R. 23 referring to R. 576). Dr. Sack's inability to describe Plaintiff's symptoms with more specificity than that they were somatic in nature, meaning "[p]ertaining to the body," does not detract from Plaintiff's credibility when she claimed her pain was caused by Fibromyalgia. 5 J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine and Word Finder* S-204 (LexisNexis 2004) (1962). This may not explain the cause of Plaintiff's Fibromyalgia, but it supports Plaintiff's claim of unexplained physical pain. While Dr. Sack's comment does not support the ALJ's determination, this is not detrimental to his overall decision as he may rely on the other evidence from Drs. Hartrick and Arbit for support.

ALJ Golden questioned her testimony that in May 1999 the entry that "[s]he has done regular exercises about 45 min." meant 45 minutes a week not a day (R. 22 referring to R. 569 and 700. *See also* 709.) The ALJ found that Plaintiff's overall credibility was damaged by inconsistencies in her explanation for why she stopped working as a cosmetologist (R. 23). Plaintiff told the Harbor Oaks Hospital staff in 1997 that she stopped working "because of problems with the staff at the workplace" (R. 158). She told Dr. Edmond that she stopped working because "this acute pain hit her" (R. 578). She indicated in the Disability Report that she had stopped working because she "developed allergies" to the chemicals she used (R. 73). The ALJ is correct that there are inconsistencies (R. 23) and he is entitled to decide that they impact her overall credibility. *Brainard*, 889 F.2d at 681 ("We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence." (citing *Reynolds v. Sec'y of*

*Health & Human Servs.*, 707 F.2d 927 (6th Cir.1983))).

The ALJ also noted that the District Office employee observed no difficulties in a personal conference with Plaintiff on January 25, 2001 (R. 107-08). This opinion from someone who is not a doctor should be given limited weight even though it is consistent with the observations of medical examiners, but this opinion when combined with the Plaintiff's other credibility problems resulted in the ALJ's determination that "all of the factors used to evaluate credibility are not in [Plaintiff's] favor" (R. 23). On a record that is this equivocal, there is no basis for this Court to reject ALJ Golden's credibility finding.

### 2.     *Treating Physicians*

#### a.     **Legal Standard**

As a general rule, "in determining whether a plaintiff is entitled to disability insurance payments, medical opinions and diagnoses of treating physicians are entitled to great weight." *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992); *see Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). However, the opinions and diagnoses of treating physicians "are not entitled to complete deference and thus are not controlling if inconsistent with other substantial evidence or unsupported by detailed objective criteria and documentation." *Arnett v. Comm'r of Soc. Sec.*, 76 Fed. Appx. 713, 717 (6th Cir. Sept. 25, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)). S*ee also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir.

1994). Rather, the ultimate decision of disability rests with the ALJ, not the treating physician, *id.*, and the Commissioner is "not bound by the opinion of a treating physician where there is substantial evidence to the contrary." *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1308 (6th Cir. 1990) (citing *Lashley v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987)).

Nonetheless, if the ALJ refuses to adopt the medical opinions of the plaintiff's treating physician, he must "set forth some basis for rejecting these opinions." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (holding that "[t]he Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error")). The opinion of a non-examining physician, in contrast, "is entitled to little weight if it is contrary to the opinion of the plaintiff's treating physician." *Shelman*, 821 F.2d at 321.

The general rule, however, is ill-suited for this case which involves a diagnosis of Fibromyalgia. *See Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003); *Runyon v. Apfel*, 100 F. Supp. 2d 447, 450 (E.D. Mich. 1999). The Sixth Circuit has joined a growing number of courts in recognizing that a complete reliance on objective evidence in Fibromyalgia cases amounts to a legal error because the disease defies diagnosis by traditional medical diagnostic techniques. *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815 (6th Cir. 1988). The Sixth Circuit explains:

> Fibrositis [now commonly referred to as fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. *In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results*—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. *There are no objective tests which can*

> *conclusively confirm the disease*; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients. *The medical literature also indicates that fibrositis patients may also have psychological disorders.* The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Id*. at 817-18 (emphasis added).

Because Fibromyalgia eludes objective diagnostic techniques, courts have been hesitant to affirm an ALJ's denial of benefits to plaintiffs who have been diagnosed with Fibromyalgia by their treating physicians where the ALJ relies solely on the lack of objective medical evidence. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108-09 (2d Cir. 2003), *Swain*, 297 F. Supp. 2d at 993, *Williams*, 104 F. Supp. 2d 719 (E.D. Mich. 2000). This hesitancy has been incorporated in 20 C.F.R. § 404.1529(c)(2) which states that a claim about the intensity of pain on the ability to work will not be rejected "solely because the available objective medical evidence does not substantiate [Plaintiff's] statements."

Although this case requires the ALJ to deviate from the general rule, the regulations still provide guidance on the proper method of assessing the diagnosis of Plaintiff's treating physician. When determining the weight to be afforded to the treating physician's opinion, the ALJ may look to: (1) the length and quality of the treatment and examining relationship, (2) supportability, (3) consistency with the record as a whole, and (4) specialization. *Runyon*, 100 F. Supp. 2d at 450 (citing 20 C.F.R. § 404.1527). Since objective medical evidence will be of limited use, the regulations require the ALJ to consider Plaintiff's subjective complaints of pain along with other relevant evidence. *See Swain*, 297 F. Supp. 2d at 989 (citing Social Security Ruling 96-7p, Evaluation of Symptoms in Disability claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483 (July 2, 1996)). Finally, in light of the Sixth

Circuit's ruling in *Preston*, the ALJ should not discount Plaintiff's subjective complaints of pain simply because they are not supported by objective clinical findings. 20 C.F.R. § 416.929(c)(2) indicates in part:

> We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available medical evidence does not substantiate your statements.

*See Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997) ("A patient's report of complaints, or history, is an essential diagnostic tool.").

This is not to say, however, that the ALJ must blindly accept the treating physician's opinion simply because Plaintiff suffers from Fibromyalgia. In cases such as this, courts have looked to a variety of factors when weighing the diagnosis of a treating physician, including whether the treating physician: (i.) identified at least 11 of the 18 specified tender points, (ii.) observed that the patient's complaints of widespread pain, stiffness and fatigue were internally consistent with common symptoms of Fibromyalgia, (iii.) systematically eliminated other possible diagnoses, (iv.) recommended and monitored various therapies, or (v.) recommended non-exertional limitations. *Green-Younger*, 335 F.3d at 108-09; *Preston*, 854 F.2d at 820; *Swain*, 297 F. Supp. 2d at 993-94.

### b. The ALJ's Credibility Determination of Plaintiff's Doctors

ALJ Golden disregarded Dr. Sack's April 11, 2001, note that Plaintiff needed ongoing treatment for her Fibromyalgia-myofascial pain syndrome because the opinion covers a time beyond the date by which Plaintiff had to establish her disability (R. 23). Dr. Sack's subsequent questionnaire completed on December 11, 2001, that related to periods prior to June 30, 2000,

was also given limited weight because it was not adequately supported by either the evidence of record or by Plaintiff's testimony. Dr. Sack found that Plaintiff would have difficulty with either prolonged sitting or standing/walking, and would need freedom to rest frequently or for extended periods at will for symptom relief (R. 590). The ALJ found that Dr. Sack did not provide the principle medical findings for this assessment, but simply checked boxes next to narrowly defined explanations (R. 23-24). The ALJ noted that the RFC questionnaire form that Dr. Sack completed was poorly drafted and did not provide Dr. Sack the opportunity to express his opinion in his own words (R. 24); *see Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (It "is well known [that] many physicians . . . will often bend over backwards to assist a patient in obtaining benefits."). The ALJ identified an adequate basis for limiting the weight given to Dr. Sack's opinion as required. *Shelman*, 821 F.2d at 320-21 ("the opinion of a treating physician is entitled to substantial deference only if it is supported by sufficient medical data").

Dr. Nusbaum concluded in 2001 that Plaintiff had the same limitations as did Dr. Sack. His opinion suffered from the same deficiencies as Dr. Sack and was also correctly accorded limited weight.

The ALJ gave limited weight to Dr. Majcher's opinion for several reasons (R. 24). No treatment notes from Dr. Majcher were submitted and without support from treatment notes or another source, her opinion was determined to have little merit. *Shelman*, 821 F.2d at 320-21. The ALJ also ascertained that Dr. Majcher overstated Plaintiff's condition based upon a review of the evidence as a whole. In addition, the opinion was based on the Plaintiff's allegations of pain rather than symptoms of depression or some other psychological ailment on which Dr. Majcher, a psychologist, would be "qualified to opine." Without more support, Dr. Majcher's opinion warrants limited weight. *See Harris*, 756 F.2d at 435.

Dr. Youssef's psychiatric diagnosis was found to be in line with the medical evidence on record (R. 24 referring to R. 573). The ALJ found no reason to disregard Dr. Youseef's opinion that Plaintiff had a GAF of 65 and good prognosis for her depression. He gave it moderate weight. Dr. Youssef is not a treating physician, but because the opinion is consistent with the other evidence, the ALJ is permitted to consider it. 20 C.F.R. § 404.1529(a) (2006).

The ALJ did not make a credibility determination with regards to all of Dr. Arbit's opinion, but only with regards to the RFC questionnaire that he completed (R. 24). The ALJ found that the questionnaire Dr. Arbit completed suffered from the same deficiencies as the one completed by Dr. Sack. The unsupported statements that were checked on the questionnaire do not form a sufficient basis to give them any significant weight.

Ultimately the decision of disability is the ALJ's and not the treating physicians. If the physician's opinion is not adequately supported or contradicted by substantial evidence, then it is not controlling. The ALJ only needs to rely on evidence that is consistent with the other credible evidence on record. The ALJ found that because Drs. Sack, Nusbaum, Majcher, and Arbit's opinions were either contradicted or unsupported they were properly given limited weight. Dr. Youssef's opinion was consistent with the other evidence and was therefore was relied upon in making the ALJ's determination.

In a case where there are several physical examinations showing the plaintiff has substantially normal physical strength and other findings, and where the treating physician's opinions are conclusory, the credibility of the plaintiff plays a greater part. In such a case, the role of the ALJ in making credibility and other findings is of greater importance and less subject to second guessing by a federal court. In this case, this is conflicting medical evidence of Plaintiff's condition, none of it clearly directing a finding of disability and much of it dependent

on Plaintiff's credibility which ALJ has stated sufficient reason to discount. If there is a sufficient basis to discount the credibility of the nature and severity of her symptoms in such a case as this one, there is a sufficient basis to reject conclusory opinions of her treating doctors.

### 3. *Plaintiff's Residual Functional Capacity*

The earliest dated medical evidence documents a 10 day stay at Harbor Oaks Hospital in July 1997. The progress notes from that hospitalization focused on her marital issues, and gastrointestinal problems which she agreed were related to her stress and were resolved with the treatment (R. 259-98). Although the evaluation mentioned that she has been diagnosed with Fibromyalgia, upon discharge, her Global Assessment of Functioning was evaluated to be 50, meaning only moderate symptoms (R. 262).

In 1997, at the direction of Dr. Wirth, Plaintiff underwent two months of physical therapy for neck and back pain. Upon being discharged, she reported good relief of overall stiffness and headaches (R. 302). It was noted that she was "extremely concerned about her 'illness' and felt that her 'illness' would eventually disable her" suggesting that at that time she did not consider herself disabled.

In 1998, when Plaintiff was involved in a motor vehicle accident, she was discharged with no limitations and no pain (R. 558). She had no tenderness or any complaint of pain with full range of motion. Her past medical history included depression, gastroesphageal reflux disease and sinusitis, but does not contain any reference to Fibromylagia, myofascial pain syndrome or chronic pain.

In her brief, Plaintiff points out that in May 2000, Michael Fox, D.O., evaluated her GAF as at best 31, but this is while she has been hospitalized for an accidental overdose (Dkt. #17, R. 323-25). It is understandable that Plaintiff's GAF was extremely low, but there is no evidence to

suggest that prior to her overdose the GAF would have been the same. In March 2001, Dr. Youssef expressed the opinion that Plaintiff's difficulties were due primarily to her physical condition; her depression was in partial remission with a good prognosis; and that she had a GAF score of 65 (R. 575). This score indicated that she had only mild symptoms of limitations. ALJ Golden gave greater weight to the opinion of Dr. Youssef.

### 4.    *Plaintiff's Ability to Perform Gainful Activity*

The ALJ found that physically, Plaintiff could lift at least 20 pound occasionally; lift 10 pounds frequently; sit, stand or walk for eight hours in a work day; push or pull without limitation; perform postural activities at least frequently; perform any manipulative functions; see, hear and speak without limitation; and perform work in any environment (R. 25). This was substantially more restrictive than the May 16, 2001, Physical Residual Functional Capacity Assessment, that found Plaintiff capable of lifting 50 pound occasionally and lifting 25 pounds frequently, but this assessment was discredited because it was made by a non-treating, non-examining individual and was not fully consistent with the evidence of record (R. 24). While Plaintiff's testimony was far more restrictive than the ALJ's opinion, as discussed earlier, the ALJ did not find Plaintiff credible and gave her testimony only limited weight.

Mentally, the ALJ determined that Plaintiff could understand, remember and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. The ALJ considered the Psychiatric Review Technique Form that was completed in January 2001, but accorded it no weight as it was completed six months after the end of Plaintiff's insured period (R. 17, 114-127). Yet, both the January 2001 and April 2, 2001, reports show only mild or

30

moderate limitations (R. 138 and R. 142-43). The ALJ gave weight to Plaintiff's comment to

Dr. Youssef in March 2001 that she did not feel depression was a major problem any longer

except when she became sad and frustrated because of her fibromyalgia (R. 18, 573). In 1997,

Plaintiff was hospitalized for depression but she told Dr. Youssef that since then "her depression

has improved a great deal with medication" (R. 573). The ALJ found it interesting that

Plaintiff's psychologist, Dr. Majcher, diagnosed her with chronic pain and not a mental

condition (R. 18, 495). He gave limited weight to Dr. Majcher's mental residual functional

capacity assessment that Plaintiff's "mental capacity [was] greatly inhibited" her because the

opinion was based upon her pain and not her depression (R. 18, 588). The ALJ did find it

important that Dr. Majcher like Dr. Youssef found that Plaintiff is able to maintain her social

skills and get along with others despite her impairments. ALJ Golden determined that Plaintiff

had the physical and mental capacity to perform a full range of unskilled light work. There is no

basis to disturb this finding. Because Plaintiff's prior work was skilled and semi-skilled (R. 739-

40), ALJ Golden found that she was incapable of returning to her past relevant work (R. 25).

Here ALJ Golden did not ask any hypothetical questions. His residual functional

capacity assessment was that Plaintiff could perform a full range of unskilled light work. As

noted above with no compelling evidence that would require the ALJ to consider her mental

impairments as mild, there is no basis for this Court to reject ALJ Golden's residual functional

capacity. The ALJ thus was entitled to use Medical-Vocational Listing 202.14 to direct a finding

of not disabled. *See Kirk v. Secretary*, 667 F.2d 524 (6th Cir. 1981).

## III.  RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary

Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**. The

parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A party may file a reply brief within five (5) days of service of a response. The reply shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.


Dated: July 29, 2008                                      s/ Steven D. Pepe
Ann Arbor, Michigan                                   United States Magistrate Judge

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the

attorneys and/or parties of record by electronic means or U.S. Mail on July 29, 2008.


_____s/ Alissa Greer_____
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298